IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MCI COMMUNICATIONS SERVICES, :
INC.,
                                  :
     Plaintiff,
                                  :
v.
                                  :     Civil Action No. GLR-11-3767
AMERICAN INFRASTRUCTURE-MD,
INC.,                             :

     Defendant.                   :

                                  :

## MEMORANDUM OPINION

THIS MATTER arises from an incident in which Defendant American Infrastructure-MD, Inc. ("AIMD") damaged one of Plaintiff MCI Communications Services, Inc.'s ("MCI") fiber optic cables while excavating on the property of CSX Transportation Company ("CSX"). MCI filed suit alleging trespass and negligence. Currently pending is MCI's Motion for Partial Summary Judgment as to trespass (ECF No. 25), AIMD's Cross-Motion for Partial Summary Judgment as to loss of use damages and attorney's fees (ECF No. 30), MCI's Motion in Limine to Exclude Opinions or Testimony from Jason Boyd (ECF No. 29), AIMD's Motion in Limine to Exclude Opinions and Testimony from Brian S. Tooley (ECF No. 35), AIMD's Motion to Strike portions of Mr. Tooley's declaration (ECF No. 40), and AIMD's Motion to Strike Michael B. Yancey's declaration (ECF No. 39).

The Court, having reviewed the pleadings and supporting documents, finds no hearing necessary. <u>See</u> Local Rule 105.6 (D.Md. 2011). For the reasons below, the Court will rule as follows: (1) MCI's Motion in Limine to Exclude Mr. Boyd's testimony will be granted in part and denied in part; (2) AIMD's Motion in Limine to Exclude Mr. Tooley's testimony will be granted in part and denied in part; (3) AIMD's Motion to Strike portions of Mr. Tooley's declaration will be granted in part and denied in part; and (4) AIMD's Motion to Strike Mr. Yancey's declaration will be granted. Moreover, (1) MCI's Motion for Partial Summary Judgment will be granted in favor of AIMD regarding trespass to land but will be granted in favor of MCI regarding trespass to chattel, and (2) AIMD's Cross-Motion for Partial Summary Judgment will be denied.

## I.  BACKGROUND[1]

MCI provides interstate telecommunication services to private and commercial customers, some of which are delivered through a network of fiber optic cables buried underground. Under an agreement with CSX (the "RO Agreement"), MCI owns and operates an underground fiber optic cable on CSX's property (the "Cable") near Tuscarora, Maryland. The Cable runs parallel to, and along the northern side of, a set of train tracks.

---

[1] Unless otherwise noted, the following facts are undisputed and are viewed in the light most favorable to AIMD, the nonmoving party.

On March 5, 2009, the Board of Commissioners for Frederick County, Maryland (the "Board"), contracted with AIMD to construct water main pipes across the train tracks on CSX's property. The construction plans required AIMD to bore across the train tracks and the Cable to construct new 42-inch water and sewer lines. Because the proposed lines crossed CSX's property, the Board entered into an agreement with CSX in which the lines were "subject to . . . [a]ll encumbrances, conditions, covenants, easements, and limitations." (Pl.'s Resp. Opp'n Def.'s Cross-Mot. for Partial Summ. J. & Reply Supp. Pl.'s Mot. for Partial Summ. J. ["Pl.'s Resp."] Ex. 28, ¶ 1.1(B), ECF No. 36-8).

Between June 26 and August 5, 2009, and in compliance with the Miss Utility Act of Maryland (the "Miss Utility Act" or "Act"), Md. Code Ann., Pub. Util. Cos. §§ 12-101 et seq. (West 2013), AIMD notified Miss Utility of Maryland's one-call system of its intent to excavate near the Cable. The one-call system notified MCI of AIMD's intent to excavate. Responding to the notification, and in compliance with the Act, MCI accurately marked the horizontal location, but not depth, of the Cable with orange paint and bright orange location-marking flags on four separate occasions.

On the morning of August 11, 2009, an AIMD work crew, led by construction superintendent Douglas Parsons, met to review

the excavation plans. Mr. Parsons advised that the area contained a fiber optic cable buried about thirty inches underground. He cautioned, however, that the crew could not rely on that approximation and told them to verify the depth by digging a test pit by hand. Prior to August 11, 2009, Mr. Parsons spoke with Laura Kennett, an MCI representative. Ms. Kennett asked Mr. Parsons to confirm the Cable's location and told him she wanted to be present for the test pitting. Following that conversation, Mr. Parsons notified Ms. Kennett of AIMD's intention to start test pitting on August 11. Ms. Kennett replied that she could not attend the test pitting on that date, to which Mr. Parsons indicated that he would start test pitting without her. Ms. Kennett did not instruct Mr. Parsons to wait.

Mr. Parsons began test pitting on August 11 without Ms. Kennett present. Using at least shovels,[2] the crew dug a test pit directly over the Cable, but to the side of the orange location markers, to determine the Cable's precise location.

_____

[2] Although neither party disputes that AIMD used shovels when digging the test pit, the parties dispute whether AIMD also used a digging bar. MCI contends that AIMD used the digging bar. (Pl.'s Resp. at 3, ECF No. 36). AIMD, however, denies using a digging bar. (Def.'s Mem. Opp'n Pl.'s Mot. for Partial Summ. J. & Supp. Def.'s Cross-Mot. for Partial Summ. J. ["Def.'s Mem. I"] at 4, ECF No. 30-2). This fact, and those that follow in footnotes 3 and 4, do not affect the outcome of the motions.

The crew struck the Cable about five hours later.[3] MCI did not give AIMD permission to damage or interfere with the Cable.

Before striking the Cable, the AIMD crew uncovered orange plastic warning tape buried in the ground directly above the Cable. The warning tape provided notice to an excavator that he was nearing a communications cable. The crew saw the warning tape but continued digging.[4] Although the initial strike caused an outage for fifty-three minutes, some customers were impacted for the next eight hours and five minutes. Later that night, MCI workers snapped the Cable while making repairs, damaging it even further. MCI fully repaired the Cable after 10.1 hours.

When telecommunications traffic is disrupted, MCI maintains its own excess substitute capacity to reroute traffic. The substitute capacity is only used for emergencies. After AIMD struck the Cable, MCI used the substitute capacity to reroute and to restore a portion of the affected traffic. The rerouted traffic, however, was still impacted, as customers complained about their lines being interrupted or down.

---

[3] The parties dispute the incident's characterization. MCI contends that AIMD "damaged" the Cable. (Pl.'s Resp. at 2). AIMD argues it merely "nicked" the Cable, which MCI completely severed while later attempting repairs. (Def.'s Mem. I at 4).

[4] Mr. Tooley, an expert for MCI, testified that the crew's "excavation should not stop once they uncover the warning tape." (Tooley Dep. 129:20-30:5, July 19, 2012, ECF No. 35-10). The warning tape indicates that the excavator is in the right location but must proceed further, with "more caution," to find the precise depth of the Cable. (Adams Dep. 31:15-20, July 20, 2012, ECF No. 30-9).

MCI filed its Complaint on December 30, 2011, alleging trespass and negligence, and seeking $27,311.81 in repair costs, damages for loss of the use of the Cable, and attorney's fees under Federal Rule of Civil Procedure 37(c)(2).[5] Following discovery, MCI now moves for partial summary judgment as to its trespass claim. Conversely, AIMD has filed a Cross-Motion for Partial Summary Judgment regarding MCI's request for loss of use damages and attorney's fees.

During the pendency of these motions, both parties filed competing motions in limine to exclude the testimony, or to strike the declarations, of three witnesses. Specifically, MCI filed a motion in limine to exclude the opinions or testimony of Jason Boyd, an expert witness for AIMD. Thereafter, AIMD filed motions to exclude the opinions and testimony of Brian S. Tooley, an MCI employee, to strike portions of Mr. Tooley's declaration, and to strike the declaration of Michael B. Yancey, another MCI employee.

## II. DISCUSSION – MOTIONS IN LIMINE

The parties have filed a series of motions in limine regarding the testimony of Jason Boyd, Brian S. Tooley, and Michael B. Yancey. Although the testimony mainly concerns MCI's

---

[5] Initially, MCI also sought punitive damages. MCI now concedes, however, that it is not entitled to punitive damages because it cannot show AIMD acted with actual malice in damaging the Cable.

negligence claim, which is not at issue here, parts of Mr. Tooley's testimony informs the Court's decision on trespass and loss of use damages. As a result, the Court will address these motions first.

## A. <u>Expert Testimony Standard of Review</u>

Under Federal Rule of Evidence 702, expert testimony is admissible if it will assist the trier of fact, and (1) is "based on sufficient facts or data," (2) is "the product of reliable principles and methods," and (3) the principles and methods have been applied "reliably . . . to the facts of the case." Fed.R.Evid. 702. The expert testimony also must rest on a reliable foundation and be relevant. <u>Daubert v. Merrell Dow Pharm.</u>, 509 U.S. 579, 597 (1993); <u>see also</u> <u>Kuhmo Tire Co. v. Carmichael</u>, 526 U.S. 137, 141 (1999) (extending <u>Daubert</u> to "the testimony of . . . other experts who are not scientists"). An aspect of relevancy is whether the expert testimony proffered "is sufficiently tied to the facts of the case," <u>Daubert</u>, 509 U.S. at 591 (citations and internal quotation marks omitted), and the expert testimony's proponent must prove its admissibility by a preponderance of evidence. <u>Id.</u> at 592 n.10.

Several factors may be relevant to the determination of reliability, including: (1) whether a theory or technique has been tested, (2) whether it has been subjected to peer review and publication, (3) the known or potential rate of error, and

(4) whether the theory or technique is generally accepted within a relevant scientific community.  Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001).  The factors, however, are "neither definitive nor exhaustive, and some may be more pertinent than others depending on the nature of the issue, the expert's particular expertise and the subject of his testimony." Newman v. Motorola, Inc., 218 F.Supp.2d 769, 773 (D.Md. 2002).

To be admissible, the expert testimony need not be "irrefutable or certainly correct."  United States v. Moreland, 437 F.3d 424, 431 (4th Cir. 2006).  Because "expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," the court's task is not to decide the correctness of the opinion.  Id. (citation and internal quotation marks omitted).

Even still, an expert's "conclusions regarding causation must have a basis in established fact and cannot be premised on mere suppositions."  McLean v. 988011 Ontario, Ltd., 244 F.3d 797, 801 (6th Cir. 2000).  If an expert's testimony is based on assumed facts, those facts "must find some support . . . in the record."  Id.; see also Daubert, 509 U.S. at 592 ("[A]n expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge or observation.").

Lastly, the "'court must exclude expert testimony if it is so fundamentally unreliable that it can offer no assistance to

the jury, otherwise, the factual basis of the testimony goes to the weight of the evidence.'" Goyal v. Thermage, Inc., No. WDQ-08-0020, 2011 WL 691185, at *3 n.8 (D.Md. Feb. 18, 2011) (quoting Meterlogic Inc. v. KLT, Inc., 368 F.3d 1017, 1019 (8th Cir. 2004)).

**B.  Analysis**

### 1.   Motion in Limine to Exclude Boyd's Testimony

The Court will grant MCI's Motion in Limine in part, excluding Mr. Boyd's testimony regarding AIMD's specific actions, but will deny the Motion in part, allowing his testimony regarding AIMD's process.  MCI argues Mr. Boyd's testimony is inadmissible because his opinion is not based on sufficient facts.  AIMD contends that Mr. Boyd testified about AIMD's process, not AIMD's actions, and thus had sufficient information based on the standards and regulations he reviewed. This Court agrees partly with AIMD.

AIMD has retained Mr. Boyd as an expert regarding MCI's negligence claim.  His report indicated his intent to testify that AIMD excavated in a reasonable manner when it damaged the Cable, and he was subsequently deposed on September 18, 2012. MCI now moves to exclude Mr. Boyd's opinions and expected testimony.  Mr. Boyd is a civil engineer with CED Investigative Technologies, Inc.  In his May 21, 2012 report, he concluded that AIMD "appropriately hand dug [the test pits over the Cable]

per OSHA, Miss Utility, and other applicable excavation standards." (Boyd Report at 5, ECF No. 37-9). He also concluded that AIMD "followed all industry standards" and that the damage to the Cable was not the result of negligence because AIMD "met all utility marking and locating responsibilities." (Id. at 5-6).

In making that determination, Mr. Boyd reviewed the Miss Utility Act guidelines and Occupational Safety & Health Administration ("OSHA") regulations. (Boyd Dep. 85:15-86:10, Sept. 18, 2012, ECF No. 35-4). He reviewed twenty-five other written materials, including the Telecommunications Industry Association ("TIA") standard, two CNA Insurance documents, a National Transportation Safety Board ("NTSB") study, and the National Utility Locating Contractors Association ("NULCA") Guide for Protection of Underground Facilities. (Boyd Report at 1-2). Mr. Boyd also reviewed the parties' pleadings and document productions. (Id.)

Despite MCI's contentions, Mr. Boyd's testimony regarding AIMD's plan to locate the Cable by hand digging is founded in the facts contained within an abundance of written materials. Coupled with Mr. Boyd's experience as an engineer, his testimony about the process AIMD used is not so fundamentally unreliable to warrant exclusion from the jury or from the scrutiny of cross-examination.

Mr. Boyd's conclusion, however, that the damage to the Cable "was a result of unfortunate circumstance, and was not a result of any negligence or breach of standard of care," is unreliable. (Id. at 6). Mr. Boyd formed his opinion without knowledge of a litany of facts. Namely, Mr. Boyd did not know (1) how the crew dug with the shovels, (2) how much dirt they removed with each scoop, (3) the soil conditions at the time, and (4) the horizontal proximity of the Cable. He identified these facts as necessary to know but admitted not knowing them. (Boyd Dep. 77:8-85:8).

Indeed, excavators are not excused from digging in a reasonable manner, even if they comply with all other procedural standards. See, e.g., Md. Code Ann., Pub. Util. Cos. § 12-120(a) ("[A] person that obtains the information required under this subtitle is not excused from: (1) performing an excavation or demolition in a careful and prudent manner; and (2) liability for damages or injury that results from the excavation or demolition."). In any event, Mr. Boyd admitted he could not ultimately determine whether AIMD acted reasonably while digging:

> Q.    How were they sticking the shovel into the ground when they hit the cable?
>
> A.    I have no idea.

> Q.   Would that be important to your determination as
>      to whether they were digging safely or acting
>      reasonably?
>
> A.   If I could witness them digging, I could say if
>      they were digging reasonably or not.  The process
>      by which they were doing this was reasonable and
>      safe, but I did not witness the digging.

(Boyd Dep. 83:3-12).

Based on his admission and personal methodology, which required him to witness the action, Mr. Boyd lacks sufficient facts to conclude whether AIMD reasonably effectuated that process.  As a result, the Court will grant MCI's Motion in Limine in part, allowing Mr. Boyd's testimony regarding the reasonableness of the process but will deny the Motion as to his testimony regarding the reasonableness of AIMD's actions.

### 2.   Motion in Limine to Exclude Tooley's Testimony

This Court grants in part and denies in part AIMD's Motion in Limine to Exclude Mr. Tooley's testimony because he has specialized knowledge of underground cable excavation, and his opinion is based on sufficient facts.  Mr. Tooley's vacuum excavation opinion, however, will be excluded because it is not supported by sufficient facts.  AIMD contends that Mr. Tooley lacks specialized knowledge and sufficient facts to support his testimony.  It also contends that Mr. Tooley's method is unreliable, and that his opinions regarding vacuum excavation

and loss of use damages should be excluded because they are based on insufficient facts.

First, Mr. Tooley has specialized knowledge based on his professional involvement with installing or observing the excavation near underground communications cables. MCI has retained Mr. Tooley as an expert regarding its negligence claim, and to establish that MCI suffered loss of use damages. After filing his report, Mr. Tooley was deposed on July 19, 2012. Mr. Tooley has a B.S. in construction engineering technology from Louisiana Tech University, and manages MCI's damage prevention and recovery programs. (Tooley Report at 3, ECF No. 35-7). A significant amount of his professional career has involved the installation of underground cables. From 1982 to 1990, Mr. Tooley installed and inspected telecommunications cables for the Henkels & McCoy engineering firm. (Id. at 1-2). In 1990, Mr. Tooley joined Mitchell Engineering, where he inspected construction sites, including those involving underground cables, until 1995. (Id. at 2).

He has worked for MCI in varying capacities every year since 1995, and has remained involved in industry organizations, such as the North American Telecommunications Damage Prevention Council, and the Data Reporting and Evaluation Committee of the Common Ground Alliance. (Id. at 3-4). This background required Mr. Tooley to maintain his knowledge of underground cable

installation, and to remain abreast of the relevant standards, guidelines, and practices.  This represents a substantial basis to conclude Mr. Tooley has the specialized knowledge to provide his expert opinion on excavating near underground telecommunications cables.

Second, the Court will deny AIMD's Motion in Limine in part as to the reasonableness of AIMD's dig because Mr. Tooley's opinions are based on sufficient facts.  Mr. Tooley's opinion regarding the use of vacuum excavation, however, will be excluded.  In his April 9, 2012 report, Mr. Tooley opined that "a reasonable and prudent excavator" would not "excavate in the manner in which AIMD was excavating" when it damaged the Cable.  (Id. at 20).  He also concluded that MCI calculated its loss of use damages in a manner "consistent with the way in which other telecommunication companies" have calculated it.  (Id. at 21).  Lastly, although Tooley did not discuss the matter in his report, he also testified that one of the bases for finding that AIMD did not act like "a reasonable and prudent excavator" was because AIMD did not use vacuum excavation.[6]  (Tooley Dep. 152:11–153:16).

---

[6] Vacuum excavation removes soil from the ground by using air or water pressure to break the soil down, then vacuuming it into a holding tank.  (Boyd Dep. 39:15–21; Tooley Dep. 100:7–12).  Its feasibility as an excavation method depends on the soil conditions.  (Boyd Dep. 40:10–21; Tooley Dep. 100:13–17).

In formulating his opinions, Mr. Tooley relied on the pleadings, document productions, Miss Utility Act guidelines, and OSHA regulations. (Tooley Report at 11-12). He reviewed reports from MCI and AIMD regarding damage to the Cable, photographs of the damaged Cable taken by MCI and AIMD, and written statements from AIMD employees. (Id.) In total, Mr. Tooley reviewed thirty-six standards, guidelines, studies, and written materials, including the same TIA, CNA, NTSB, and NULCA materials as Mr. Boyd. (Id. at 10-12).

Mr. Tooley also exchanged emails with Peter Crome, (Tooley Dep. 96:20-97:8), an MCI employee who inspected the Cable on-site immediately after it was damaged. (Crome Dep. 34:12-18, July 18, 2012, ECF No. 25-13). Mr. Crome told Mr. Tooley the location markers had been placed directly above the Cable. (Tooley Dep. 97:20-21). Coupled with the fact that the warning tape had also been placed directly above the Cable, Mr. Tooley concluded that AIMD was negligent because it dug directly above the Cable. (Id. at 99:3-14). He opined that AIMD should have dug to the side of the orange location markers instead. (Id. at 99:15-21). Mr. Tooley's conclusion that AIMD excavated in a manner contrary to that of "a reasonable and prudent excavator" is sufficiently based on the fact that the AIMD crew dug directly above the Cable and not merely on pure speculation.

Mr. Tooley's opinions regarding whether AIMD should have used vacuum excavation, however, will be excluded. In concluding that AIMD acted unreasonably, Mr. Tooley explained that AIMD should have dug to the side of the Cable or used vacuum excavation. (Id.) But vacuum excavation can only be employed under certain soil conditions. Mr. Tooley did not render any opinion as to the soil conditions at the site. (Id. at 57:10-14; but see id. at 100:13-17) (noting that vacuum excavation "would be difficult in rock, [and] other than that, vacuum excavation is applicable"). Although vacuum excavation is often reasonable in locating underground cables, Mr. Tooley has no basis to conclude its usage in locating the Cable was more reasonable than the method AIMD employed without first determining if the site presented appropriate soil conditions. His opinion is based on an assumption with no factual support. Mr. Tooley's opinion regarding the reasonableness of vacuum excavation thus is not based on sufficient facts, and it will be excluded.[7]

_____

[7] Nonetheless, Mr. Tooley's vacuum excavation opinion should have been disclosed in Mr. Tooley's report under Rule 26(a)(2)(B) because opinions as to what a party should have done are not factual testimony. Mr. Tooley's observation is instead based purely on his specialized knowledge and is expert testimony. Because MCI did not include vacuum excavation in Mr. Tooley's report under Rule 26(a)(2)(B), his vacuum excavation opinion would also be excluded on those grounds.

Lastly, for the reasons discussed in the following section, the Court will deny AIMD's Motion in Limine to Exclude Mr. Tooley's testimony concerning loss of use damages to the extent he discusses how MCI determined the replacement value by calculating the cost of a replacement cable from another carrier. To the extent Mr. Tooley testified as to the market value of the Cable, the Court also refuses to strike Mr. Tooley's testimony because its inclusion is harmless.

### 3. Motion to Strike Portions of Tooley's Declaration

#### a. Motion to Strike Standard of Review

Federal Rule of Civil Procedure 26(a)(2)(A) requires parties to disclose "the identity of any witness [they] may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed.R.Civ.P. 26(a)(2)(A). Rule 26(a)(2)(B) further requires parties to produce written reports for any witness who is "retained or specially employed to provide expert testimony in the case" or "whose duties as the party's employee regularly involve giving expert testimony." Fed.R.Civ.P. 26(a)(2)(B). The Court refers to these witnesses as "retained experts."

A retained expert's written report must contain, among other things:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming

them; [and] (iii) any exhibits that will be used to summarize or support them . . . .

Id.

The report must contain any opinions formed specifically in anticipation of litigation, or otherwise outside the normal course of a duty. See Sullivan v. Glock, Inc.*,* 175 F.R.D. 497, 500 (D.Md. 1997); Nat'l R.R. Passenger Corp. v. Ry. Express, LLC, 268 F.R.D. 211, 216 (D.Md. 2010) (citing Desrosiers v. Giddings & Lewis Mach. Tools, LLC, No. WDQ-07-2253, 2009 WL 4406149, at *5 (D.Md. Nov. 25, 2009), rev'd in part on other grounds, Desrosiers v. Mag Indus. Automation Sys., LLC, No. WDQ-07-2253, 2010 WL 2132826 (D.Md. May 25, 2010)).

Conversely, to the extent a witness's opinion is based on facts learned or observations made "in the normal course of duty," the witness is a hybrid and need not submit a Rule 26(a)(2)(B) report. Id. A party seeking to avoid producing an expert report bears the burden of demonstrating that the witness is a hybrid. Lee v. Valdez, No. 3:07-CV-1298-D, 2008 WL 4287730 (N.D.Tex. Sept. 18, 2008); Cinergy Commc'ns v. SBC Commc'ns*,* No. 05-2401-KHV-DJW, 2006 WL 3192544, at *3 (D.Kan. Nov. 2, 2006); see Tokai Corp. v. Easton Enterprises, 632 F.3d 1358 (Fed.Cir. 2011) (upholding the district court's exclusion of testimony where proffering party failed to produce evidence that witness was a hybrid). Moreover, a witness can serve as a hybrid

witness as to some opinions, but also serve as a retained expert as to others.  <u>Sullivan</u>, 175 F.R.D. at 500.

Parties are nevertheless required under Rule 26(a)(2)(C) to file disclosures for the testimony their witnesses intend to offer as hybrid witnesses.  <u>Wake v. Nat'l R.R. Passenger Corp.</u>, No. PWG-12-1510, 2013 WL 1316431, at *6 (D.Md. Mar. 27, 2013). Rule 26(a)(2)(C) presents a less onerous disclosure standard than Rule 26(a)(2)(B).  Specifically, Rule 26(a)(2)(C) only requires the written report to disclose: "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."  Fed.R.Civ.P. 26(a)(2)(C).

Federal Rule of Civil Procedure 37(c) allows the court to sanction parties if they fail to provide the information required by Rule 26(a)(2)(B) or (C).  If a party fails to disclose information or a witness under Rule 26(a), he cannot use that information or witness unless the failure is substantially justified or harmless.  Fed.R.Civ.P. 37(c)(1). The United States Court of Appeals for the Fourth Circuit articulated a five-factor test for determining whether the nondisclosure is substantially justified or harmless:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which

> allowing the evidence would disrupt the trial; (4) the
> importance of the evidence; and (5) the nondisclosing
> party's explanation for its failure to disclose the
> evidence.

S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003). The first four factors mainly relate to the harmlessness exception, while the final factor – the nondisclosing party's explanation – primarily relates to the substantial justification exception. Id. Further, the Court has "broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis." Id.

### b. Motion to Strike Analysis

The Court (1) refuses to strike ¶ 27 because, even though it contains expert testimony that MCI did not disclose in Mr. Tooley's Rule 26(a)(2)(B) disclosure, the failure to disclose is harmless; (2) will strike ¶¶ 35–37 because they rely on a report that MCI did not timely disclose, and the failure is neither substantially justified nor harmless; and (3) declines to strike ¶¶ 44–45, 51–54, and 56–57 because they contain factual testimony that Mr. Tooley proffered as a hybrid witness that MCI failed to disclose under Rule 26(a)(2)(C), but that failure is harmless.

MCI submitted Mr. Tooley's declaration on November 13, 2012, to support its Cross-Motion for Partial Summary Judgment.

AIMD asks this Court to exclude eleven paragraphs of Mr. Tooley's fifty-seven-paragraph declaration because those paragraphs contain opinions or reference documents that were not noted in Mr. Tooley's Rule 26(a)(2)(B) designation. Specifically, AIMD argues ¶¶ 27, 35–37, 44–45, 51–54, and 56–57 of Mr. Tooley's declaration (1) express opinions on ownership of the land in which the Cable was buried, (2) reference the Mastars Customer Impact Report (the "Mastars Report") to establish the number of impacted customers, and (3) attempt to establish the market value of the Cable. AIMD contends that none of those opinions or reports were provided in Mr. Tooley's report, during his deposition, or otherwise by MCI during the course of discovery.

MCI maintains that those eleven paragraphs are factual testimony distinct from the expert testimony Mr. Tooley is designated to provide. MCI further contests that all but ¶ 27 are in response to the argument AIMD made in its Motion for Partial Summary Judgment that MCI would receive a "windfall" if awarded loss of use damages.

### i. Paragraph 27

Paragraph 27 contains expert testimony that MCI should have disclosed in Mr. Tooley's Rule 26(a)(2)(B) disclosure. Paragraph 27 of Mr. Tooley's declaration provides:

At the point AIMD damaged it on August 11, 2009, the Cable was buried completely within CSX's property pursuant to [the RO Agreement] between CSX and Lightnet. MCI has succeeded to Lightnet's rights in that agreement and the portion of CSX's property where the Cable was buried on August 11, 2009 when AIMD damaged it.

(Tooley's Decl. ¶ 27).

During the course of his seventeen-year employment with MCI, Mr. Tooley served as a contractor, outside plant engineer, lead engineer in MCI's Relocation and Upgrades group, and member of MCI's damage recovery program. (Id. ¶¶ 7–10). His duties in those roles required him, among other things, to conduct feasibility studies, select installation routes for new cables, become knowledgeable of industry standards, and review the documents necessary to compute damages when an MCI cable or facility was damaged. (Id.) MCI does not allege, however, that those duties required Mr. Tooley to acquaint himself with the RO Agreement outside the bounds of this litigation. Because the RO Agreement was executed before his employment with MCI, Mr. Tooley played no role in negotiating, reviewing, consummating, or determining ownership or succession rights under the RO Agreement. As such, Mr. Tooley formed his opinion of land ownership under the RO Agreement outside the normal course of his duties and only upon his review of the RO Agreement in preparation for this action. That testimony was offered in Mr. Tooley's capacity as a retained expert.

Be that as it may, the Court will not strike ¶ 27 because MCI's failure to disclose that testimony during discovery is harmless. The five S. States factors weigh in MCI's favor. Under the first factor, the information conveyed is not new to AIMD, as MCI alleged ownership of the property in the Complaint and submitted the RO Agreement as an exhibit in support of its Cross-Motion for Partial Summary Judgment. (See ECF No. 30-18). Only the use of Mr. Tooley as the information's source should come as a surprise to AIMD. The second factor, however, is split between the two parties. On the one hand, the trial date has not been set and thus the disclosure of the ¶ 27 testimony is well-before any ninety-day deadline the Rules impose. See Fed.R.Civ.P. 26(a)(2)(D)(i) (requiring the disclosure be made "at least 90 days before the date set for trial or for the case to be ready for trial"). On the other hand, Mr. Tooley's statement comes in the midst of competing cross-motions for partial summary judgment.

Under the third factor, as stated before, ¶ 27 does not present new information and should not disrupt trial. The fourth factor weighs in AIMD's favor because, although the information helps MCI by establishing ownership for its trespassing claim, ¶ 27 does not present an immediate necessity given that MCI has already submitted the RO Agreement to the Court. Under the fifth factor, because this Court decided that

¶ 27 contains expert testimony, MCI's position, that ¶ 27 contains factual testimony of which Rule 26(a) does not require disclosure, lacks merit. Therefore, even though the failure to disclose the ¶ 27 testimony is not substantially justified, it is harmless and the Court declines to preclude it.

### ii. Paragraphs 35–37

The Court will strike ¶¶ 35–37 of Mr. Tooley's declaration because they rely upon the Mastars Report, which MCI did not disclose until it filed Mr. Tooley's declaration on November 11, 2012 – four months after Mr. Tooley was deposed and two months after the discovery period had ended. The Mastars Report, which MCI generated as a result of the damage to the Cable, allegedly contains the name of each customer whose service was affected by the damage and the size of the cable circuits. (Id. ¶ 35). Specifically, the Mastars Report allegedly shows that ninety-one more customers were affected during the incident than the thirty-six customers who called MCI to complain. (Id. ¶¶ 34–35). Mr. Tooley reviewed this report to determine whether MCI appropriately calculated its loss of use damages.

Here, the S. State factors weigh in AIMD's favor. The first factor cuts against MCI, as AIMD was undoubtedly surprised to learn about a report tripling the total number of affected customers midway through the motion for partial summary judgment process. Under the second factor, the surprise is not as easy

to cure as the one in ¶ 27. The Mastars Report contains substantive data previously unknown to AIMD and, by disclosing now, MCI thwarted AIMD's opportunity to depose Mr. Tooley as to the data. Although no trial date has been set, the Court underscores the difficulty of re-deposing a witness after the parties have already filed lengthy cross-motions for partial summary judgment.

For its part, factor three is on MCI's side because the mere admission of a report does not risk disrupting trial. Factor four, however, leans in AIMD's favor because the number of impacted customers is immaterial when determining repair costs or loss of use damages based on the Cable's market or substitute value. Lastly, the fifth factor weighs against MCI as it has conceded that it inadvertently failed to provide AIMD a copy of the Mastars Report, and has since produced it. (Pl.'s Resp. Def.'s Mot. to Strike Portions of Tooley's Decl. at 13, ECF No. 42). As such, MCI should have disclosed the Mastars Report under Rule 26(a)(2)(B) as a document upon which Mr. Tooley relied in reaching his expert opinion. Its failure to do so was neither harmless nor substantially justified. The Court will therefore strike ¶¶ 35-37 of Mr. Tooley's declaration.

### iii. Paragraphs 44–45, 51–54, and 56–57

Paragraphs 44–45, 51–54, and 56–57 of Mr. Tooley's declaration contain undisclosed factual testimony that Mr.

Tooley intends to offer as a hybrid witness. As a result, the Court will not strike those paragraphs because MCI's failure to disclose the information contained therein, although not substantially justified, is harmless. Paragraphs 44 and 45 describe MCI's substitute capacity and an agreement with other carriers to reroute switched traffic at the rate of $0.02 per minute. (Tooley Decl. ¶¶ 44-45). In ¶¶ 51-54, Mr. Tooley noted the cost per mile to install and to test the Cable, and calculated the total value of the Cable at over $27 million. (Id. ¶¶ 51-54). Finally, in ¶¶ 56-57, Mr. Tooley calculated the total cost to maintain substitute capacity at over $30 million. (Id. ¶¶ 56-57).

As a member of MCI's Service Delivery and Assurance organization, Mr. Tooley has been reviewing the documents necessary to pursue the recovery of damages and calculating MCI's damages since 1998. (Id. ¶ 10). This experience has given Mr. Tooley a familiarity with the data necessary to calculate damages, evidenced by his involvement in at least three similar actions concerning damage to MCI's telecommunications cables, one of which was in Maryland. (See id. ¶ 11). Because Mr. Tooley's employment requires him to maintain a familiarity with the data and facts used to calculate damages in actions against those who damage MCI's telecommunications cables, the data and facts upon which Mr.

Tooley relies in ¶¶ 44-45, 51-54, and 56-57 was obtained through the course of his duties and thus Mr. Tooley presents that testimony as a hybrid witness. MCI needed to disclose the testimony in those paragraphs under Rule 26(a)(2)(C).

The issue then becomes whether Mr. Tooley's report adequately discloses, under Rule 26(a)(2)(C), the testimony he proffers as a hybrid witness in ¶¶ 44-45, 51-54, and 56-57 of his declaration. The Court concludes that it does not. In his report, Mr. Tooley discloses:

> 52. Both courts and the Federal Communication Commission have concluded that the DS-3[8] is the common denominator used throughout the telecommunication industry as a measure of capacity.

> 53. I am familiar with the methodology MCI used to calculate its loss of use damages in this case. MCI based its loss of use damages on the cost of procuring sufficient capacity from another carrier, at a DS-3 level, to replace the capacity of the transport systems that were active and impacted on [the Cable] when AIMD damaged it.

> 54. [T]he manner in which MCI has calculated its loss of use damages in the present action is consistent with the way in which MCI has calculated, and the [c]ourts have approved, MCI's loss of use damages in those other matters.

> 55. Based on my experience in pursuing fiber damage claims for MCI, my participation in industry forums, and my observation of the way other telecommunications companies calculate loss of use damages, the manner in which MCI has

_____

[8] DS-3s are electrical circuits that stream data at 44.7 megabits per second. (Tooley Decl. ¶ 28). The Cable carried a capacity of 1,152 DS-3s. (Id. ¶ 31).

> calculated its loss of use damages is consistent
> with the way in which other telecommunications
> companies . . . calculate loss of use damages.

(Tooley Report at 20-21) (emphasis added).

Although his report discloses his intention to testify as to how MCI calculated its loss of use damages, as required under Rule 26(a)(2)(C), Mr. Tooley fails to mention even generally the market value of the Cable or its substitute capacity as facts or opinions he intends to offer. Instead, Mr. Tooley's report offers that he will testify as to the value of a replacement cable from another carrier. Therefore, ¶¶ 51-54 of Mr. Tooley's declaration contains undisclosed testimony because they pertain to the cost to install and test the Cable and not to the replacement value of a similar cable from another carrier. Paragraphs 56-57 of Mr. Tooley's declaration also contain undisclosed testimony because they pertain to the cost of operating the spare capacity and make no mention of the Cable's replacement value. Lastly, ¶¶ 44-45 of Mr. Tooley's declaration contain undisclosed information because his report does not indicate, to any degree, that he will offer testimony as to MCI's spare capacity or its value.

MCI's failure to disclose the testimony in ¶¶ 44-45, 51-54, and 56-57 was harmless but not substantially justified. First, it should come as no surprise to AIMD that MCI would attempt to establish the market value of the Cable. As AIMD admits, it has

contested MCI's valuation since the early stages of the litigation. The surprise, however, is in the timing. Knowing that AIMD disputed MCI's valuation, MCI waited to establish the Cable's market value through Mr. Tooley's and Mr. Yancey's declarations until after AIMD raised the issue in its Cross-Motion for Partial Summary Judgment. Mr. Tooley at least revealed at his deposition that MCI maintained spare capacity for emergency use at a great expense. (See Tooley Dep. 149:11-18). AIMD should thus be less surprised that Mr. Tooley offered the spare capacity testimony in his declaration.

For the second factor, the same analysis applies as to ¶¶ 35-37 in that no trial date has been set, but the parties are currently embroiled in two pending cross-motions for partial summary judgment and AIMD did not have an opportunity to depose Mr. Tooley as to these statements. Third, the admission of a few pieces of testimony would not likely disrupt trial. The fourth factor can go either way. The market value of the Cable is of no consequence to MCI's recovery of loss of use damages. That MCI maintains spare capacity exclusively for emergency use, however, is paramount to its claim for loss of use damages. Lastly, MCI's explanation that it did not need to disclose the information in ¶¶ 44-45, 51-54, and 56-57 because it was factual testimony offered in response to AIMD's arguments is without merit because the testimony of a hybrid witness is still subject

to the disclosure requirements of Rule 26(a)(2)(C), and MCI should have been aware that AIMD challenged the Cable's valuation.

Accordingly, Mr. Tooley offers the testimony in ¶¶ 44–45, 51–54, and 56–57 as a hybrid witness and MCI should have disclosed that testimony under Rule 26(a)(2)(C). Because it did not, Mr. Tooley's report is insufficient, and the testimony's inclusion in his declaration is untimely. The Court declines to strike ¶¶ 44–45, 51–54, and 56–57 of Mr. Tooley's declaration, however, because the failure to disclose the information was harmless, even though it was not substantially justified.

### 4. Motion to Strike Yancey's Declaration

The Court will grant AIMD's Motion to Strike Mr. Yancey's declaration because Mr. Yancey offers expert testimony for which MCI did not file a Rule 26(a)(2)(B) disclosure, the failure of which was neither substantially justified nor harmless. Federal Rule of Civil Procedure 26(a) requires parties to disclose "the name . . . of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses . . . ." Fed.R.Civ.P. 26(a)(1)(A)(i). The Rule 26(a)(1)(A) disclosure is required unless the information will be used solely for impeachment "or as otherwise stipulated or ordered by the court." Fed.R.Civ.P. 26(a)(1)(A).

AIMD asks the Court to strike Mr. Yancey's declaration because MCI failed to disclose Mr. Yancey's identity and information under Rule 26(a)(1)(A), did not designate Mr. Yancey as an expert witness, and did not timely identify Mr. Yancey as a person with knowledge of any fact alleged in the Complaint. MCI argues the Court exempted the parties from making Rule 26(a)(1) disclosures, Mr. Yancey's testimony is lay testimony for which Rule 26(a)(2) does not require disclosure, and it timely identified Mr. Yancey because AIMD did not challenge the Cable's market value until AIMD filed its Cross-Motion for Partial Summary Judgment.

Although this Court exempted the parties from making Rule 26(a)(1) disclosures, (see Scheduling Order at 2, ECF No. 9), MCI needed to identify Mr. Yancey and disclose his testimony under Rule 26(a)(2)(B) because Mr. Yancey's declaration offers expert testimony. MCI filed Mr. Yancey's declaration on November 13, 2012, two months after the close of discovery, in response to a question AIMD raised regarding the Cable's market value. In his declaration, Mr. Yancey states that the replacement rate for the Cable as of 2009 was $142,759.14 per mile. (Yancey Decl. ¶ 8, ECF No. 36-11). Accordingly, Mr. Yancey calculated the replacement value for the entire 191-mile length of the Cable at $27,266,995.74. (Id. ¶ 10).

Mr. Yancey has worked as a Network Engineering manager for MCI since 2005. (Id. ¶ 4). His duties as Network Engineering manager required him to "perform[] feasibility studies, estimate[] construction costs, prepare[] bid packages for construction projects, evaluate[] bids from outside contractors for construction projects, prepare[] and manage[] construction budgets, and approve[] invoices from outside contractors, equipment venders, right-of-way owners, and governmental agencies relating to construction of fiber optic cable routes." (Id. ¶ 5). In short, despite his experience and specialized knowledge of the costs of telecommunications in Maryland generally, neither Mr. Yancey nor MCI proffer any connection that Mr. Yancey has with the Cable specifically and how he knows its value from 2009 firsthand.

Mr. Yancey did not testify as to having handled any account or construction matter involving the Cable or requiring him to previously have known the Cable's value, particularly from 2009. He also concedes that his valuation is derived from "my past experience, my knowledge of fiber optic cable construction techniques, . . . and my knowledge of the costs to construct fiber optic cable routes." (Id. ¶ 6). His testimony is based on his specialized knowledge and not his personal knowledge. As a result, Mr. Yancey's declaration offers expert testimony, which should have been disclosed under Rule 26(a)(2)(B).

Here, all but one of the S. States factors favor AIMD. First, introducing undisclosed expert testimony from a previously unidentified witness months after the end of discovery would surely surprise AIMD. Second, the cost to cure AIMD's surprise would be great: Mr. Yancey would need to be deposed entirely, or else AIMD would lose its opportunity to cross-examine his testimony before trial. See S. States, 318 F.3d at 598 (approving the district court's assertion that permitting an opposing party to cross-examine an expert at trial does not cure the offering party's failure to disclose new opinion before trial). Upon Mr. Yancey's deposition, AIMD could also seek to modify its own offering to counter his expert testimony.

Third, allowing expert testimony without a Rule 26(a)(2)(B) disclosure would surely disrupt the trial. Indeed, the failure of a party "to provide [expert] disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case." Saudi v. Northrop Grumman Corp., 427 F.3d 271, 278–79 (4th Cir. 2005) (citation and internal quotation marks omitted). Fourth, Mr. Yancey's testimony is very important to MCI, as his testimony allows MCI to establish the market value of the Cable, which is necessary to calculate loss of use damages.

Lastly, under the fifth factor, MCI's explanation for not filing a Rule 26(a)(2)(B) disclosure for Mr. Yancey is lacking. Specifically, MCI's contention that it "had no reason to believe the Cable's market value was at issue in, or had any relevance to, this action" because it "did not make any allegations concerning the Cable's value in its complaint" lacks merit. (Pl.'s Resp. Def.'s Mot. to Strike Decl. of Yancey at 6, ECF No. 43). AIMD made clear it intended to contest the amount of loss of use damages in its Answer and affirmative defenses. (See Answer at 3–5). Moreover, the market value or replacement value of the property at issue is paramount in determining loss of use damages. See Yaffe v. Scarlett Place Residential Condo., Inc., 45 A.3d 844, 853 (Md.Ct.Spec.App. 2012) (outlining the rule for loss of use damages in Maryland). MCI should have known, well before AIMD filed its Motion for Partial Summary Judgment, that it needed to establish the Cable's market value. Therefore, MCI's identification of Mr. Yancey after the close of discovery, and while two cross-motions for partial summary judgment are pending, is neither substantially justified nor harmless. The Court will strike Mr. Yancey's declaration.

## IV. DISCUSSION – CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Having disposed of the motions in limine, the Court will now review the cross-motions for partial summary judgment.

A.    **Summary Judgment Standard of Review**

Under Federal Rule of Civil Procedure 56(a), the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247–48 (emphasis in original).

A material fact is one that might affect the outcome of a party's case. Id. at 248; JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). The materiality is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>Hooven-Lewis v.</u>
<u>Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001).

A genuine issue concerning a material fact arises when the
evidence is sufficient to allow a reasonable jury to return a
verdict in the nonmoving party's favor. <u>Anderson</u>, 477 U.S. at
248. Rule 56(e) requires the nonmoving party to go beyond the
pleadings and by its own affidavits, or by the depositions,
answers to interrogatories, and admissions on file, designate
specific facts showing that there is a genuine issue for trial.
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).

Moreover, this matter is before the Court through its
diversity jurisdiction. This Court is thus obligated to
interpret the law in accordance with the Court of Appeals of
Maryland. <u>Ellis v. Grant Thortnon LLP</u>, 530 F.3d 280, 287 (4th
Cir. 2008); <u>Wells v. Liddy</u>, 186 F.3d 505, 527-28 (4th Cir.
1999). Where the law is unclear, this Court must rule how it
appears the Court of Appeals of Maryland would rule, and it may
consider restatements, treatises, and recent decisions of the
Court of Appeals. <u>Wells</u>, 186 F.3d at 528.

**B.  <u>Analysis</u>**

    **1.  Trespass Claim**

        **a.  Trespass to Land**

This Court will grant summary judgment in favor of AIMD
regarding AIMD's liability for trespass to land because the RO

Agreement does not grant MCI a possessory interest in the land where the Cable is buried, and MCI cannot, therefore, allege trespass to land.  Trespass to land involves the intentional or negligent intrusion upon the property of another or his possessory interest therein.  Royal Inv. Grp., LLC v. Wang, 961 A.2d 665, 687 (Md.Ct.Spec.App. 2008) (citation omitted).  To prove trespass, the plaintiff must show: (1) the defendant interfered with a possessory interest in his property, (2) through the defendant's physical act or force against that property, (3) which was executed without the plaintiff's consent.  Id. at 688 (citation omitted).  Consent is a complete defense to a trespass claim.  Id. (citations omitted).

MCI argues it did not consent to AIMD interfering with the part of CSX's property in which the Cable was installed, and that actual possession of the land is the crucial factor, not the nature of MCI's title.  AIMD contends that MCI has not established a possessory interest in the land because the RO Agreement was for a right-of-way easement, and that MCI consented to the excavation.  The Court agrees, in part, with AIMD.

Nothing in the RO Agreement between CSX and MCI suggests an intention by CSX to convey to MCI more than the right to install and operate the Cable.  The Court must look at the language of the right-of-way deed to determine, with reasonable certainty,

the intention of the parties to convey a possessory interest or an easement.  Richfield Oil Corp. of N.Y. v. Chesapeake & C. B. R. Co., 20 A.2d 581, 586 (Md. 1941) (citations omitted).

The RO Agreement confers rights to install, operate, and maintain the Cable under and along CSX's right of way.  (Def.'s Mem. I Ex. 14, §§ 1.29, 2.01).  The RO Agreement makes clear that "nothing in this Agreement constitutes any grant to [MCI] of any right to use [CSX's] Rights-of-Way" in a way not covered by any existing agreement.  (Id. at art. III).  Nor does the RO Agreement restrict CSX from carrying on its normal operations along its rights of way.  (Id.)  Because the RO Agreement only grants MCI the right to install and operate the Cable, the RO Agreement does not convey a possessory interest in the land to MCI.

MCI seemingly argues, however, it possesses the land surrounding the Cable by virtue of the Cable being located there.[9]  MCI provides no support for this proposition, and it appears to be contrary to traditional tort law.  See Dan B. Dobbs, et al., The Law of Torts § 55 (2d ed. 2012)[10] (explaining

---

[9] MCI does not appear to contest AIMD's allegation that the RO Agreement conveys an easement and not title.  MCI apparently argues instead that title is not relevant to finding a possessory interest if the Cable is buried in the ground.

[10] Maryland courts often rely on Dobbs's treatise on torts. See, e.g., Pendleton v. State, 921 A.2d 196, 206 (Md. 2007); Muthukumarana v. Montgomery Cnty., 805 A.2d 372, 395-96 (Md. 2002).

that the owners of underground cables have no right, unless they own the land, to exclude others from digging on the property); see also MCI Commc'ns Servs., Inc. v. Hagan, 74 So.3d 1148, 1152-53 & n.4 (La. 2011) (refuting a similar argument where MCI did not have a servitude on the land). Indeed, a contractor who is lawfully upon the owner's land is not a trespasser simply because he digs in the area where there is an underground cable. Dobbs, Law of Torts § 55.[11] There is thus no genuine issue of material fact with regard to MCI's trespass claim as to AIMD's interference with MCI's right of servitude.[12] The trespass to land claim will be denied and summary judgment will be granted in AIMD's favor.

### b. Consent

MCI implicitly consented to AIMD's digging on the relevant property but did not consent to interference with the Cable. Consent is a complete defense to a trespass to land claim.

---

[11] Dobbs notes that the analysis may change if the owner of the underground cable has an exclusive easement. Dobbs, Law of Torts § 55. The RO Agreement confers an exclusive easement as it relates to the installation of other fiber optic cables. (Def.'s Mem. I Ex. 14, § 4.06). But nothing in the RO Agreement prevents contractors from lawfully digging on CSX's property in the area around the Cable, evidenced by CSX's subsequent agreement with the County to install the sewer and pipe lines on the property, and language in the RO Agreement that CSX can still grant an interest in its right-of-way at any time. (Id. § 4.07(f)).

[12] Nonetheless, any dispute over the possessory interest of the land is moot because MCI consented to AIMD's excavation on the property, thereby constituting a complete defense to MCI's trespass claim. See infra Part IV.B.1.b.

_Wang_, 961 A.2d at 688 (citations omitted).  Consent is the "willingness in fact for conduct to occur," which can "be manifested by action or inaction and need not be communicated to the actor."  _Mitchell v. Balt. Sun. Co._, 883 A.2d 1008, 1016 (Md.Ct.Spec.App. 2005) (quoting Restatement (Second) of Torts, § 892).  If the alleged trespasser reasonably understands the words or conduct to be intended as consent, then the words or acts constitute apparent consent.  _Id._  As such, "[c]onsent may be express or implied," and the determination of whether consent was given is a question of fact.  _Wang_, 961 A.2d at 688 (citation omitted).

Two facts indicate that MCI authorized AIMD to dig on the property where the Cable was installed.  First, once notified of the dig under the Miss Utility Act, MCI marked the Cable's location with orange paint and the location markers four separate times during a six-week span.  (Pl.'s Mem. at 2-3).  Second, when discussing the dig with AIMD, Ms. Kennett asked AIMD to "make sure [it] knew where the cable was."  (Kennett Dep. 23:4-6, July 18, 2012, ECF No. 30-6).  With nothing to suggest otherwise, AIMD could reasonably understand these acts to be consent to enter upon the land and dig, particularly when there are procedures under the Act that MCI could have used had it not consented.  _See_ Md. Code Ann., Pub. Util. Cos. § 12-134(a)(2) (providing a procedure under the Miss Utility Act had

AIMD intended "to carry out the excavation or demolition [in a manner] likely to result in damage to" the Cable). MCI did not use those procedures. MCI's actions, as a matter of law, therefore, implicitly authorize AIMD to dig on the property and to locate the Cable.

The parties also dispute whether Ms. Kennett's statements provided consent. Ms. Kennett requested to be present at the dig. (Kennett Dep. 23:10-11). When AIMD contacted her prior to digging, however, she acknowledged her unavailability and did not instruct AIMD to wait. (Id. at 23:10–25:18). She later testified that time constraints generally prevented her from being present at every dig. (Id. at 25:20–22). Following its conversation with MCI, AIMD would have no reason to believe MCI withdrew consent and that it was no longer allowed to dig. Moreover, Ms. Kennett's subsequent testimony implies that it is customary for contractors to proceed without her, and that AIMD could dig on the property even if she was not present. See Mitchell, 883 A.2d at 1016 (citation omitted) (noting that, where there is silence or inaction, the court will consider the customs of the community). These acts constitute apparent consent.

But neither Ms. Kennett's statements nor the other facts imply consent to interfere with the Cable. The very act of complying with the Miss Utility Act infers that MCI sought to

prevent interference with its underground utilities. See Md. Code Ann., Pub. Util. Cos. § 12-102 (noting that compliance protects underground facilities from damage and loss of services to the public). Moreover, MCI located the Cable with orange paint and location markers prior to the dig, buried bright orange tape underground about six inches above the Cable, and communicated with AIMD through Ms. Kennett. MCI took these measures to ensure AIMD avoided the Cable during the test digging, and construction of the sewer and water lines. MCI thus neither explicitly nor implicitly consented to AIMD's interference with the Cable. Moreover, MCI's trespass to chattel claim survives AIMD's consent defense.

### c. Trespass to Chattel

#### i. Asserting Trespass to Chattel in the Complaint

MCI clearly demarcated a trespass to chattel claim in the Complaint. MCI argues it asserted a claim for trespass to the Cable, and that its possessory interest in the land is irrelevant for its resulting trespass to chattel claim. AIMD contends MCI only alleged trespass to land. AIMD also maintains that, even if MCI alleged trespass to chattel, no evidence exists that AIMD intentionally interfered with the Cable.

In its Complaint, MCI alleged it "sustained disturbance to its right of use or servitude [of CSX's property], and damage to

. . . the Cable." (Compl. ¶ 10, ECF. No. 1) (emphasis added).
A clear demarcation of the two clauses by a comma and
conjunction designates an additional yet separate trespass claim
against the Cable itself. It suggests MCI intended to claim
trespass against the Cable in addition to trespass against any
possessory interest it had in CSX's property, even though it did
not clearly indicate as such. See Fed.R.Civ.P. 1 (suggesting
the rules "be construed and administered to secure the just,
speedy, and inexpensive determination of every action and
proceeding"); Monge v. Portofino Ristorante, 751 F.Supp.2d 789,
792 n.1 (D.Md. 2010) (noting that, under Rule 1, "the Court will
not exalt form over substance"). The Court thus finds that MCI
asserted a claim for trespass to chattel because it added a
separate clause for it in the Complaint.

### ii. Merits of the Trespass to Chattel Claim

This Court will grant summary judgment in favor of MCI
with regard to its trespass to chattel claim because AIMD
intermeddled with the Cable. Maryland law recognizes trespass
to chattel claims. Staub v. Staub, 376 A.2d 1129, 1133
(Md.Ct.Spec.App. 1977); Strausburger v. Barber, 38 Md. 103, 107–
08 (1873). Trespass to chattel involves the "intentional use or
intermeddling with the chattel in possession of another," such
that "the chattel is impaired as to its condition, quality, or
value." Restatement (Second) of Torts, §§ 217(b) and 218(b)

43

(1965) (emphasis added); see also United States v. Arora, 860 F.Supp. 1091, 1097 (D.Md. 1994), aff'd, 56 F.3d 62 (4th Cir. 1995).

The Restatement defines "intermeddling" as "intentionally bringing about a physical contact with the chattel." Restatement (Second) of Torts, § 217 cmt. E. A defendant, for example, intermeddles with another's property if he intends to make physical contact with it or intentionally directs an object against it. Id.; see also Hagan, 74 So.3d at 1150, 1155 ("[T]respass to chattels appears to require intent to interfere with another's interest in movable property . . . .").

Maryland courts have long held that trespass to land claims can be maintained even when the trespass was unintentional or unwitting. Balt. Gas & Elec. Co. v. Flippo, 705 A.2d 1144, 1149 (Md. 1996). But they have also found trespass to chattel to be analogous to conversion, requiring the intent to act but not necessarily the intent to deprive. See Keys v. Chrysler Credit Corp., 494 A.2d 200, 208 (Md. 1985) ("'The intent required is not necessarily a matter of conscious wrongdoing. It is rather an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.'") (citation omitted)); see also Darcars Motors of Silver Spring, Inc. v. Borzym, 818 A.2d 1159, 1172-73 (Md.Ct.Spec.App. 2003) (same) (citation omitted); Dobbs, Law of Torts § 60 ("It is

enough if the defendant had an intent to act upon the property; . . . he is liable even though he had no intent to harm or even to invade another's interests."). Maryland courts would likely require only the intent to act voluntarily.

As such, a Maryland court would likely find AIMD liable for trespass to chattel when it intended to dig, regardless of whether it intended to interfere with the Cable. Even when viewed most favorably to AIMD, the AIMD crew voluntary set its shovel in motion by continuing to dig past the orange tape buried above the Cable. (Pl.'s Mem. in Supp. Pl.'s Mot. for Partial Summ. J. ["Pl.'s Mem."] at 3, ECF No. 25-1). AIMD thus intermeddled with the Cable when it intentionally put the shovel in motion and physically contacted the Cable without consent. (Id.) There is therefore no dispute of material fact as to whether AIMD intermeddled with the Cable and this Court will grant summary judgment in favor of MCI with regard to MCI's trespass to chattel claim.

### d. Miss Utility Act

The Miss Utility Act does not abrogate MCI's trespass claim. AIMD argues the Act conflicts with common law trespass because trespass imposes a strict liability standard whereas the Act imposes a negligence standard on excavators who damage underground utilities. MCI maintains, however, that the Act

does not preempt any existing remedies for damage to property. The Court agrees with MCI.

For a statute to abrogate a right available at common law, its language must expressly indicate or imply an abrogation by "a statutory scheme that is so clearly contrary to the common law right that the two cannot occupy the same space." Nickens v. Mount Vernon Realty Grp., LLC, 54 A.3d 742, 755 (Md. 2012) (citing Selig v. State Highway Admin., 861 A.2d 710, 723 (Md. 2004)); see also Robinson v. State, 728 A.2d 698, 702 (Md. 1999) (explaining "that statutes are not presumed to repeal the common law 'further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law'") (citation omitted).

This requires the Court to construe the Miss Utility Act. In doing so, the Court's aim is to determine the legislative purpose, ends to be accomplished, or evils remedied by the provisions contain therein. Miller v. Mathias, 52 A.3d 53, 71–72 (Md. 2012) (citations omitted). The Court looks at the statute's normal, plain language, "reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." Id. at 72 (citations and internal quotation marks omitted). The

analysis ends if the statute's language is clear and unambiguous. Id. (citations omitted).

The Miss Utility Act is also a statutory scheme, which means this Court must construe the statute as a whole, interpreting each of its provisions in the context of the entire statutory scheme. Whiting-Turner Contracting Co. v. Fitzpatrick, 783 A.2d 667, 672 (Md. 2001) (citations omitted). Statutes on the same subject are thus read together and "harmonized to the extent possible, reading them so as to avoid rendering either of them, or 'any portion, meaningless, surplusage, superfluous or nugatory.'" Id. (quoting Gov't Emps. Ins. Co. & GEICO v. Ins. Comm'r, 630 A.2d 713, 717 (Md. 1993)).

The Miss Utility Act protects underground facilities from damage or dislocation as a result of excavation. Md. Code Ann., Pub. Util. Cos. § 12-102. Underground facilities include personal property buried underground to convey "electronic, telephonic, or telegraphic communications," particularly cables. Id. §§ 12-101(o)(1)(ii) and 12-101(o)(2). The Act requires excavators to notify its "one-call system" of their intent to excavate. Id. § 12-124(a). The system then notifies the owners of underground facilities in the geographic area, who must mark the location of the underground facility along the horizontal plane if their underground facility is within five feet of the proposed excavation. Id. §§ 12-126(a)-(b).

Telecommunications companies that own or operate an underground facility are obligated to participate in the system. See id. § 12-120(c) (explaining that owners who fail to comply are liable for the repairs to any property damaged by excavation). Similarly, excavators that violate provisions of the Act or fail to exercise due care in damaging the underground facility are liable to the owner for civil or other penalties. See, e.g., id. § 12-120(a) (imposing a duty of care and holding excavators liable for "for damages or injury that results from the excavation or demolition"); id. § 12-120(b) (deeming individuals negligent when they damage underground facilities while not complying with the Act); id. § 12-135(a) (assessing penalties for excavators who fail to provide the required notice).

Further, the Act imposes a standard of care:

A person performing an excavation or demolition shall exercise due care to avoid interference with or damage to an underground facility that an owner-member has marked in accordance with § 12-126 of this subtitle.

Id. § 12-127(c)(1).

Although the Court of Appeals of Maryland has found that the Act's due care provisions do not impose a strict liability standard, there is no indication the court found the Act so clearly contrary to common law trespass that both could not exist in the same space. Bd. of Cnty. Comm'rs of Garrett Cnty.,

48

Md. v. Bell Atl.-Md., Inc., 695 A.2d 171, 179-80 (Md. 1997). The court even noted that the Act was consistent with at least one tenet of common law trespass, determining the Act did not give telecommunications companies the right to bury their underground facilities anywhere they pleased. Id. at 175-76.

Further, the expressed language in the Act does not suggest MCI would be precluded from bringing a trespass claim. Nor does the text of the Act indicate that all underground facility owners must exclusively resort to its statutory process. See Nickens, 54 A.3d at 755 (concluding that a foreclosure proceeding statute does not preclude a remedy at common law). Accordingly, the Act neither expressly nor impliedly abrogates common law trespass. See Level 3 Commc'ns, LLC v. William T. Cantrell, Inc., No. 3:12 CV 081-HEH, 2012 WL 1580468, at *2-3 (E.D.Va. May 4, 2012) (allowing a trespass claim despite an additional negligence claim under Virginia's Miss Utility Act); MCI WorldCom Network v. Brockman, 66 Va.Cir. 438 (2000) (same).[13]

---

[13] Virginia's Miss Utility Act also contains a provision expressly stating that the Act "shall not be construed to . . . abrogate any rights, duties, or remedies existing under law." Va. Code Ann. § 56-265.25C (West 2013). Maryland's Miss Utility Act does not contain similar language. The Act provides, however, that excavators who comply with the Act are not excused from "liability for damages or injury that results from the excavation or demolition." Md. Code Ann., Pub. Util. Cos. § 12-120(a)(2).

## 2.   Loss of Use Damages

The Court will deny AIMD's Motion for Partial Summary Judgment as to MCI's request for loss of use damages.   Under Maryland law, compensatory damages are recoverable for the value of lost use of repairable property.   <u>Yaffe</u>, 45 A.3d at 853. Although compensatory damages are typically recoverable only to the extent the party is injured, <u>Exxon Mobil Corp. v. Albright</u>, No. 15, 2013 WL 673738, at *35 (Md. Feb. 26, 2013), Maryland law allows injured parties to calculate loss of use damages based on the rental value of comparable property for the time it took to make repairs.   <u>D'Ambrogi v. Unstatisfied Claim & Judgment Fund Bd.</u>, 305 A.2d 136, 138 (Md. 1973).

Although Maryland law is silent as to the issue here, MCI cites a string of persuasive, non-binding federal district court cases in which similarly situated telecommunications companies were not presumptively precluded from loss of use damages even though they did not actually rent substitute capacity following their accidents but had relied on spare capacity that was only used for emergencies. (<u>See</u> Pl.'s Resp. at 12 n.14) (citing, <u>e.g.</u>, <u>Level 3 Commc'ns, LLC v. Floyd</u>, 764 F.Supp.2d 945, 956 (M.D.Tenn. 2011); <u>Sprint Commc'ns Co. v. W. Innovations, Inc.</u>, 618 F.Supp.2d 1101, 1119 (D.Ariz. 2009); <u>Level 3 Commc'ns, LLC v. Toomer Elec. Co.</u>, 557 F.Supp.2d 745, 747–48 (E.D.La. 2008)).

Those cases are consistent with the ruling of the Supreme Court of the United States in <u>Brooklyn E. Dist. Terminal v. United States</u>, 287 U.S. 170 (1932), in which the Court explained that a ship owner is entitled to loss of use damages if he maintains a spare boat for emergencies, but not if he increases the workload of the boats already in general use. <u>Id.</u> at 176–77. Under this theory, telecommunications companies "should not be punished for being proactive and avoiding the need to obtain substitute capacity after . . . outage[s], which would [be] . . . . highly problematic for [their] customers." <u>Floyd</u>, 764 F.Supp.2d at 955. The theory only holds, however, if the substitute capacity is reserved specifically for emergencies. <u>Id.</u>

This Court will deny AIMD's Motion for Partial Summary Judgment with regard to loss of use damages for two reasons. First, MCI calculated the comparable replacement rates from another carrier. (Pl.'s Resp. at 4, 13; Tooley Dep. 148:16–149:10). This is an appropriate measure to calculate loss of use damages under Maryland law, even though MCI never incurred replacement costs. Second, although MCI does not allege it lost customers or had to issue refunds as a result of the incident, (Pl.'s Resp. at 14), it maintained excess capacity to reroute the telecommunications traffic to prevent that from happening. (Tooley Dep. 140:15–20). MCI maintained the excess capacity, at

a cost of "millions of dollars," for emergency purposes.  (Id. at 141:7-11, 149:11-18).  The excess capacity is analogous to the spare boat in Brooklyn Eastern in that MCI should not be penalized for being proactive in preventing further harm in the event of accidents.[14]

A few issues remain, however. First, some traffic was interrupted during the 10.1 hours in which crews worked to restore the Cable for which MCI may claim actual loss of use. For example, only some traffic was rerouted, not all of it. Second, it is unclear how long service was down before traffic was rerouted, and the parties dispute the admissibility of the evidence produced to determine the market value of the Cable. These determinations may play a role in what damages for loss of use AIMD owes MCI.  Lastly, the parties must calculate loss of use damages based on the value of the substitute capacity for the time it took MCI to make repairs.  D'Ambrogi, 305 A.2d at 138.  There are thus genuine issues of material fact and summary judgment as to MCI's loss of use damages will be denied.

---

[14] This Court decided similarly in MCI Network Servs., Inc. v. LAI Constr. Servs., Inc., No. 05-3221-CCB (D.Md. Jan. 3, 2007).  In a ruling from the bench on a motion for partial summary judgment, the Court equated MCI's excess capacity to the Brooklyn Eastern spare boat and concluded under Maryland law that substitute property "can be an appropriate measure of damages, even if the actual substitute property is not rented." Id. at 57-58.

### 3. Attorney's Fees

The Court will deny AIMD's Motion for Partial Summary Judgment as to MCI's request for attorney's fees because the Motion is improperly before the Court. Although generally not recoverable in an action for compensatory damages, attorney's fees can be awarded when provided by statute. Hess Constr. Co. v. Bd. of Educ. of Prince George's Cnty., 669 A.2d 1352, 1354 (Md. 1995). Federal Rule of Civil Procedure 37 allows the recovery of attorney's fees if a party fails to admit a request under Rule 36 and the requesting party later proves that matter is true. Fed.R.Civ.P. 37(c)(2).

MCI alleges it will eventually be entitled to attorney's fees under Rule 37(c)(2) because AIMD denied requests for admissions and MCI will prove those matters are true. AIMD argues MCI is not entitled to attorney's fees because attorney's fees are not recoverable in actions for compensatory damages, and MCI has not specified which admissions its claim is based upon. Per its own admission, MCI has requested from AIMD admittances on unspecified matters but has not yet proven those matters to be true. As MCI cannot yet make this showing, this matter is improperly before the Court and the Motion will be denied.

## IV.  CONCLUSION

For the foregoing reasons, the Court will, by separate Order, (1) GRANT MCI's Motion in Limine to Exclude Mr. Boyd's testimony as to AIMD's specific actions, but DENY the Motion as to his testimony concerning whether AIMD's process was reasonable; (2) DENY in part AIMD's Motion in Limine to Exclude Mr. Tooley's testimony but GRANT in part to the extent that Mr. Tooley's discusses vacuum excavation; (3) GRANT in part AIMD's Motion to Strike Portions of Mr. Tooley's declaration as to ¶¶ 35-37, but DENY the Motion in part as to ¶¶ 27, 44-45, 51-54, and 56-57; and (4) GRANT AIMD's Motion to Strike Mr. Yancey's declaration.  Moreover, the Court will (1) GRANT, in favor of AIMD, MCI's Motion for Partial Summary Judgment as to AIMD's liability for trespass to land, but also GRANT, in favor of MCI, the Motion as to AIMD's liability for trespass to chattel; and (2) DENY AIMD's Motion for Partial Summary Judgment for loss of use damages and attorney's fees.

Entered this 12th day of August, 2013

/s/

_____
George L. Russell, III
United States District Judge